**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 13, 2026

**BY ECF**
The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Paul Johnson*, 24 Cr. 706 (VM)**

Dear Judge Marrero:

In the early hours of February 6, 2022, defendant Paul Johnson shot and killed 18-year-old Jayquan McKenley. On the night of the murder, McKenley—who was an aspiring rap artist—was standing in the street, about to film a music video, when a maroon SUV slowly drove past. The defendant was sitting in the front passenger seat of the SUV, armed, with the window rolled down. As the vehicle approached McKenley, the defendant fired repeatedly, striking McKenley twice, from close range. The vehicle then sped away. McKenley stumbled into the back seat of a nearby car, and his friends drove him to the hospital. He was pronounced dead shortly after arriving.

That night was not the only time that the defendant tried to shoot and kill another person. In July 2020, the defendant opened fire on a group of perceived gang rivals, running up to them and shooting while the group sat in front of an apartment building. One victim was struck in the ribs and another in the leg. Fortunately, both survived after being rushed to the hospital. The defendant has also pleaded guilty to manslaughter in New York County Supreme Court and is awaiting sentencing. That conviction is based on the defendant's participation in a separate drive-by killing that took place the summer before the defendant murdered McKenley.

This Court is scheduled to sentence the defendant on November 20, 2026. The parties have agreed in their plea agreement that Johnson faces an advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") sentence of 40 years' imprisonment. That sentence, however, would not be sufficient to satisfy the purposes of sentencing in 18 U.S.C. § 3553(a). In light of Johnson's tremendous history of violence and ongoing disciplinary infractions while in federal custody, such a sentence would not afford adequate deterrence or sufficiently protect the public. Nor would a 40-year sentence appropriately reflect the seriousness of the defendant's offenses or provide for just punishment, given the significant consequences of the defendant's violence—including the senseless loss of an 18-year-old's life. Rather, for the reasons set forth below, the Government submits that a sentence of 45 years' imprisonment would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

## I. Background

### A. Offense Conduct

Since at least 2020, the defendant has been a member of a gang named the "OGz" (which stands for "Original Goonz" or "Original Gangsterz"). (Presentence Investigation Report, dated October 19, 2026 ("PSR") ¶ 8). The gang is based in the South Bronx, primarily in several public housing complexes in the area between East 153 and 161st Streets and Morris and Courtlandt Avenues. (PSR ¶ 8). Members of the OGz sell narcotics and commit acts of violence, among other crimes. (PSR ¶ 9). The OGz have rivalries with other gangs, and an OGz member who commits violence against those rivals will increase his status within the OGz. (PSR ¶ 9). The defendant is an aspiring rap artist who frequently mentioned the OGz in his lyrics and displayed the OGz hand sign in his music videos. (PSR ¶ 8).

The Murder of Jayquan McKenley: McKenley was associated with a gang that had a rivalry with the OGz. (PSR ¶ 14). Like the defendant, McKenley was an aspiring rap artist. The defendant and McKenley, who were rivals, each disrespected the other's gang in their rap songs and music videos. (PSR ¶ 14).

On February 6, 2022, at approximately 2:15 a.m., McKenley was preparing to film a music video, standing with others on Greene Avenue in the Bedford-Stuyvesant neighborhood of Brooklyn. (PSR ¶ 15). The defendant had been made aware of McKenley's presence at the location and sat in the passenger seat of the maroon SUV (the "SUV"), which had driven to Bedford-Stuyvesant from the Bronx. (PSR ¶ 15). As the SUV approached McKenley, who was in the street, the SUV slowed down. The defendant, through the open passenger-side window, shot at McKenley three times. (PSR ¶ 15). Two of the bullets struck McKenley in the chest.

Surveillance video of the shooting from a nearby doorbell camera has been separately submitted to the Court as Government Exhibit 1.[1] As reflected in the video, after McKenley was shot, he stumbled into a nearby car with several other individuals who were with him; they drove McKenley to the hospital, where he was pronounced dead shortly after arrival. (PSR ¶ 16). An autopsy revealed that the two bullets that struck McKenley in the chest both perforated his heart, liver, and other vital organs before exiting his body. McKenley was 18 years old when he died.

Using video and other evidence, law enforcement agents identified the SUV, which had been reported stolen from the Bronx several days before the murder. (PSR ¶ 17). Three days after the murder, the SUV was found abandoned in the Bronx. A hat left in the vehicle had the defendant's DNA on it. (PSR ¶ 17).

Records showed that the SUV traveled in a manner consistent with its involvement in the murder, crossing the Robert F. Kennedy Bridge from the Bronx to Brooklyn shortly before the murder, and returning toward the Bronx immediately after the murder. (PSR ¶ 18). Not only had the SUV been stolen, but the license plate affixed to the SUV for the vehicle's travels that night

---

[1] McKenley is in the top right corner of the video, wearing a dark jacket, closest to the SUV as it drives past. The video captures audio.

had also been stolen from a different vehicle, which was registered to an address on Thieriot Avenue in the Soundview neighborhood of the Bronx. (PSR ¶ 18).

On March 12, 2022—approximately one month after McKenley's murder—members of the NYPD arrested the defendant for a different murder (which took place in July 2021 in Manhattan). (PSR ¶ 19). Members of law enforcement seized the defendant's phone incident to the arrest. Federal agents later reviewed the defendant's phone pursuant to a search warrant in connection with the investigation into McKenley's murder. (PSR ¶ 19).

The defendant's phone contained photographs of the SUV shortly after it was stolen, along with electronic communications reflecting that the defendant traveled to and from Brooklyn on the night of the murder—including the address of the location where the defendant shot and killed McKenley. (PSR ¶ 20). The defendant also exchanged text messages with a woman about meeting up after the murder; the updates the defendant gave about his timing were consistent with the movements of the SUV. The woman the defendant was meeting that night lived on the same block of Thieriot Avenue where the license plate affixed to the murder vehicle had been stolen. Additionally, the defendant's phone contained photographs of the murder weapon, which law enforcement agents recovered about two years after the murder and connected to the murder through ballistics analysis. (PSR ¶ 20). In communications the day after the murder, the defendant attempted to sell the murder weapon. (PSR ¶ 20).

<u>The July 2020 Non-Fatal Shooting</u>: Another rival of the defendant's OGz gang was a gang named the "Young Gunnaz," or "YGz." (PSR ¶ 10). That gang's territory included an apartment complex known as "Maria Lopez Plaza," located at the intersection of East 151st Street and Morris Avenue in the Bronx—within blocks of the OGz's territory. (PSR ¶ 10).

At approximately 6:00 a.m. on July 5, 2020, the defendant ran up to a group sitting on the front steps of Maria Lopez Plaza and opened fire, striking two individuals in the group. (PSR ¶ 11). Video surveillance of the shooting, which has been separately submitted to Chambers as Government Exhibits 2A and 2B, shows the defendant and two other individuals walking south on Morris Avenue toward East 151st Street, looking in the direction of Maria Lopez Plaza.[2] (PSR ¶ 11). The defendant then walked close to a convenience store's camera and then abruptly turned and began walking the other direction on Morris Avenue, consistent with the defendant or his associates either having seen the convenience store's cameras or making sure the group in front of Maria Lopez Plaza did not see them. (PSR ¶ 11).

The defendant put a white shirt over his head as he walked away, then ran across the street toward Maria Lopez Plaza. (PSR ¶ 12). The defendant, with the white shirt over his head, opened fire on the group sitting in front of the apartment building, then ran north on Morris Avenue back toward OGz territory. (PSR ¶ 12).

---

[2] Specifically, Government Exhibit 2A captures the shooting. Government Exhibit 2B is a view from across the street, showing the defendant before the shooting (wearing a white tank-top and dark pants). The video then shows the defendant run across the street to commit the shooting (the shooting location is to the left, off screen), then running back to OGz territory (top right of the screen) after the shooting.

**B. Procedural History and Applicable Guidelines Range**

On December 18, 2024, a grand jury in this District returned an indictment charging the defendant with racketeering conspiracy, murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, and a firearm offense. (Dkt. No. 2). The defendant was brought by writ into federal custody from Rikers Island, where he was being held pending trial on his state murder case in New York County Supreme Court. The Government understands that, in that case, the defendant was alleged to have been the driver of a dirt bike for the drive-by killing of a rival gang member. (*See* PSR ¶ 57).

On June 30, 2025, a grand jury in this District returned a superseding indictment charging the defendant with two additional counts—attempted murder and assault with a deadly weapon in aid of racketeering, and a firearm offense—based on the July 2020 non-fatal shooting. (Dkt. No. 20).

On July 29, 2026, the defendant pleaded guilty to conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), based on his involvement in McKenley's murder; a firearm offense, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), also in connection with McKenley's murder; and attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3) and (5), in connection with the July 2020 shooting. (*See* PSR ¶¶ 1–4).

The defendant pleaded guilty pursuant to a written plea agreement (the "Plea Agreement") in which the parties agreed to a Guideline calculation, which is consistent with the Guideline calculation in the PSR. As to the conspiracy to commit murder in aid of racketeering count, the offense level is 43, because McKenley was killed. *See* U.S.S.G. §§ 2A1.5(c)(1) and 2A1.1. As to the attempted murder and assault with a dangerous weapon in aid of racketeering count—based on the July 2020 shooting—the parties agreed that the base offense level is 33, pursuant to U.S.S.G. § 2A2.1(a)(1), and that four levels are added because of the severity of the victims' injuries, pursuant to U.S.S.G. § 2A2.1(b)(1), resulting in an offense level of 37. Under the grouping provisions, the combined offense level is 44. *See* U.S.S.G. §§ 3D1.2 and 3D1.4. After a three-level reduction for acceptance of responsibility, the total offense level is 41. The parties agreed that the defendant was in Criminal History Category II, which results in a Guideline range of 360 months to life.[3] Because the statutory maximum term of imprisonment for the conspiracy to commit murder in aid of racketeering count is 10 years, and the statutory maximum for the attempted murder and assault with a dangerous weapon count is 20 years, the combined statutory maximum for those two counts is 30 years, which is the Guideline sentence for those counts.

The Guideline sentence for the Section 924(c) discharge count is the statutory minimum term of imprisonment, which is ten years, and which must be imposed to run consecutively to any other sentence. *See* U.S.S.G. § 2K2.4(b). Accordingly, the defendant's Guideline sentence is 40 years' imprisonment—composed of consecutive sentences of 10 years on Count Two (the conspiracy to commit murder in aid of racketeering count); 10 years on Count Four (the Section

---

[3] The PSR concluded that the defendant was in Criminal History Category III, based on two youthful offender adjudications that were not accounted for in the Plea Agreement. That difference in criminal history category does not affect the ultimate Guideline sentence the defendant faces.

924(c) discharge count); and 20 years on Count Five (the attempted murder and assault with dangerous weapon in aid of racketeering count). The Probation Office recommends a sentence of 40 years.

## II. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

## III. A Sentence of 45 Years' Imprisonment Is Appropriate

The facts of the case demand a serious sentence. The defendant traveled from one side of the city to the other in order to commit a murder. He shot his victim from close range, repeatedly, leaving no doubt about what the defendant intended. One can only imagine the desperation and panic in the car with McKenley as his friends tried to speed to hospital while McKenley bled to death. Meanwhile, the defendant sought to dispose of the murder weapon, and the murder vehicle—previously stolen by the defendant or an accomplice—was found abandoned on the side of the highway. The defendant engaged in all of this conduct within two years of the July 2020 shooting, in which he opened fire on a group, seriously wounding two individuals. It is fortunate that no one in that close-range ambush was killed. Like McKenley, the group at Maria Lopez Plaza posed absolutely no threat to the defendant when he opened fire on them.

In the Government's view, an above-Guideline sentence is necessary because that conduct does not even represent the full scope of the defendant's violence. In between the July 2020 shooting at Maria Lopez Plaza and the February 2022 murder of McKenley, the defendant participated in an additional drive-by killing in Manhattan (which took place in July 2021), for which he has pleaded guilty to manslaughter in New York County Supreme Court. The Government understands that the parties in that case have agreed to ask that the agreed-upon 20-year sentence for that case run concurrently to any federal sentence (the state-court judge is scheduled to impose sentence on November 25, 2026). Under the Guidelines sentence that the Probation Office recommends in this case—a total of 30 years' imprisonment on Counts Two and Five, followed by a mandatory consecutive 10-year sentence on Count Four—the defendant would face no additional punishment for his role in that additional killing to which he has pleaded guilty. Nor would a Guideline sentence account for other aspects of the defendant's violent history, including multiple youthful offender adjudications for robberies, which reflect multiple probation violations. (*See* PSR ¶¶ 51–53).

Put differently, a defendant convicted of the same federal crimes—but who did not commit the additional homicide of which the defendant has been convicted in state court, or have a history of youthful offender adjudications—would face the same Guideline sentence as a defendant. An above-Guideline sentence is thus necessary to account for the defendant's criminal history.

Such a sentence is also necessary in light of the defendant's ongoing misconduct while in federal custody. The Presentence Report reflects numerous infractions at the MDC, including assault with serious injury and possession of a dangerous weapon. (PSR ¶ 6). As the defense is aware from materials produced in discovery, in February 2025, the defendant was transported from the MDC on a "day writ" so that he could appear in his case in New York County Supreme Court. When the United States Marshals were transporting him back into federal custody, they discovered that the defendant had concealed in his underwear a latex package containing a green leafy substance, which appears to be either tobacco or marijuana, for consumption at the MDC. The defendant engaged in all of this conduct after having been in state custody for nearly three years, and, for many of the infractions, after having been in federal custody for over an additional year. The defendant is several years older since he committed the crimes he has been convicted of, but he does not appear to have meaningfully matured. In light of the defendant's violent past, the Court should take into account the defendant's ongoing misconduct in jail when evaluating the need to protect the public and to deter the defendant from future crimes.

A sentence of 45 years is also necessary to provide for just punishment. The defendant seriously injured two individuals. Undeterred, he then extinguished an 18-year-old's life. The loss that McKenley's family has suffered is detailed in a letter from McKenley's father, Perry Williams, which is attached as Government Exhibit 3 (the Government expects that McKenley's family will wish to address the Court at sentencing). In his letter, Mr. Williams wrote that his son's death "has left a hole in our family that will never be filled." He explained the impact on McKenley's brothers and sisters, including on his younger sister, who "is struggling with his absence and has bad dreams about her brother being gone"—a type of pain that "no child should have to carry." In short, Mr. Williams concluded, McKenley "had a future. He had people who loved him. We will spend the rest of our lives missing him."

The defendant's actions—and the consequences of those actions—demand a sentence of 45 years' imprisonment (540 months). The Government respectfully requests that the Court impose that sentence: 10 years (120 months) on Count Two; 15 years (180 months) on Count Four; and 20 years (240 months) on Count Five, each imposed to run consecutively.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: ______________________________
Patrick R. Moroney
Assistant United States Attorney
(212) 637-2330

Cc (by ECF): David Stern, Esq.